## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONICA R. MILLER,

*Plaintiff,*

v.

LEHIGH UNIVERSITY,

*Defendant.*

CIVIL ACTION
NO. 19-00965

---

**PAPPERT, J.**                                    **February 20, 2020**

### MEMORANDUM

Dr. Monica Miller, an African American woman and Professor of Religion and Africana Studies at Lehigh University, sued the school after Lehigh appointed her to lead the Africana Studies Program. Lehigh did so because the African American male head of the program came under investigation for sexual misconduct. Miller believes that Lehigh forced her into this position—for which she says she was unqualified—because it needed a "token" African American woman to be the face of Africana Studies. Her ascent engendered hostility from her co-workers. This hostility and the stress of leading a program in crisis eventually caused Miller great emotional distress. Amidst the turmoil, Miller cut off contact with Lehigh, which led to her removal as Director of the Women, Gender and Sexualities Studies Program. Miller alleges that Lehigh discriminated and retaliated against her under Title VII and 42 U.S.C. § 1981. Lehigh moves for summary judgment on all claims. Because each claim is either procedurally defective or lacking any evidentiary support, the Court grants Lehigh's Motion.

I

A

In 2013, Lehigh University hired Dr. Monica Miller to a tenure-track position as an Assistant Professor of Religion and Africana Studies. *See* (Mot. for Summ. J. Ex. C, at 1, ECF No. 69-5). The next year, Lehigh appointed Miller as the Director of Women, Gender and Sexualities Studies (WGSS). (Lehigh Undisputed Facts ¶ 4, ECF No. 69-1.)[1] As compensation for the directorship, Lehigh gave her a one-ninth increase in salary and reduced her teaching load by one course. (Mot. for Summ. J. Ex. E, at 2, ECF No. 69-7.) For Miller's initial hire and appointment as Director of WGSS, Lehigh issued her a formal appointment letter. *See* (Lehigh Undisputed Facts ¶¶ 1, 7).

1

After receiving tenure, Miller spent the 2016–2017 academic year on sabbatical. *See* (*id.* at ¶ 9); (Mot. for Summ. J. Ex. G, ECF No. 69-9). While on leave, she considered serving on several committees when she returned to Lehigh. *See* (*id.* Ex. H, at 3, ECF No. 69-20). In response, a colleague and friend cautioned Miller against overloading herself "with an unsustainable schedule of tasks." (*Id.* at 2.) The Director of Africana Studies, Dr. James Peterson, agreed with that advice—particularly because he would be on sabbatical for the 2018 spring semester, and the prospective Interim Director, Dr. Kwame Essien, might "lean on [Miller] from time to time for direction and input." (*Id.*)

In July of 2017, Miller returned to Lehigh as WGSS Director and an active member of Africana Studies. *See* (Mot. for Summ. J. Ex. A, at 100:1–9, ECF No. 69-3)

---

[1]     Unless otherwise noted, Miller has admitted to all facts taken from Lehigh's Statement of Undisputed Facts. *See* (Miller Statement of Facts, ECF No. 70).

(Miller Dep.). At a meeting, Miller and the other Africana Studies faculty supported Peterson's motion to nominate Essien as Interim Director for the spring semester. *See* (*id*. Ex. I, at 2, ECF No. 69-11). Lehigh later issued Essien an appointment letter stating that he would begin as Interim Director on January 1, 2018, and receive a one-ninth increase in salary and "a reduction of one course" from his teaching load as compensation. (Mot. for Summ. J. Ex. J, at 2, ECF No. 69-12.)

2

In early November of 2017, Lehigh suspended Peterson pending a sexual-harassment investigation. *See* (Lehigh Undisputed Facts ¶ 17). Dr. Donald Hall, the Dean of the College of Arts and Sciences, learned of Peterson's suspension with about five weeks left in the fall semester. *See* (*id*. at ¶ 19). Though Peterson was Director of Africana Studies, Essien was already slated to take over that role in January. *See* (Mot. for Summ. J. Ex. B, at 24:3–22, ECF No. 69-4) (Hall Dep.). And because the last few weeks of the semester were typically slow, Hall was not worried about formally appointing someone to assume Peterson's administrative duties before Essien took over as Interim Director. *See* (*id*. at 27:22–28:8). Rather, Hall's main logistical problem was finding someone to supervise Peterson's independent study students and cover the Black Poetics course that Peterson had been teaching. (*Id*. at 7:2–6.)

To solve this problem, Hall met with Miller—the senior, tenured member of Africana Studies—and another professor. (*Id*. at 8:16–17.) At the meeting, Hall asked Miller to teach the Black Poetics course for the rest of the semester. (*Id*. at 16:9–15, 68:16–21); (Miller Dep. 118:8–14.) He did so because the course was cross-listed with English and Africana Studies and involved "hip hop culture," an area of Miller's expertise. (Hall Dep. 68:19); *see* (Lehigh Undisputed Facts ¶ 24); (Tr. of Summ. J. Hr'g

3

63:2–6, ECF No. 77). Miller, however, deemed herself unqualified to teach Black Poetics because she was not a scholar of English. (Miller Statement of Facts ¶ 24, ECF No. 69-1.) Nevertheless, she agreed to teach the course. *See* (Miller Dep. 118:8–14, 119:8–14); (Hall Dep. 14:5–14, 16:12–15); (Lehigh Undisputed Facts ¶ 23). As thanks for Miller's help, Hall gave her a "course off"—that is, a reduced class load without reduced pay—for a future semester. (Mot. for Summ. J. Ex. K, at 2, ECF No. 69-13.) Though Miller later used this course off, she asked to stop teaching Black Poetics after only a week or two; Lehigh granted that request and assigned other professors to cover the remaining class sessions. *See* (Lehigh Undisputed Facts ¶ 36); (Miller Dep. 120:2–4). There is no evidence that Lehigh compensated these other professors for their efforts. *See* (Tr. of Summ. J. Hr'g 50:19–20).

During their meeting, Hall also asked Miller to supervise a few of Peterson's independent study students and act "as a point of contact to field questions about [Peterson's] suspension" from Africana Studies faculty. (Lehigh Undisputed Facts ¶ 22.) Whether Miller freely agreed to assume these duties or Hall forced her to do so is unclear. *Compare* (*id.* at ¶¶ 27, 29), *with* (Miller Statement of Facts ¶¶ 27, 29); (Miller Dep. 114:10–119:21). Either way, Hall picked Miller for these tasks because she was the only tenured faculty member in Africana Studies, as well as "a seasoned administrator." (Hall Dep. 19:21); (Lehigh Undisputed Facts ¶ 28); *see also* (Mot. for Summ. J. Ex. M, at 14:7–18, 42:19–22, ECF No. 69-15) (Raposa Dep.).

Miller left the meeting believing that she had become Interim Director of Africana Studies. *See* (Resp. Opp'n Summ. J. Ex. S, at 1, ECF No. 70-21); (Miller Dep. 105:21–108:12). In her view, Hall had effectively appointed her to that role by asking

her to teach Black Poetics, supervise Peterson's independent study students and be the point of contact within Africana Studies.[2]  *See* (*id.* at 105:21–108:12, 114:3–115:16).  Yet neither Hall nor anyone at Lehigh ever issued Miller an appointment letter or offered her—in writing or verbally—the position of Interim Director.  *See* (*id.* at 105:21–108:12); (Hall Dep. 31:22–32:4); (Mot. for Summ. J. Ex. D, at 15:9–10, ECF No. 69-6) (Farrell Dep.).  Whether she had the official paperwork or not, Miller's time as Interim Director lasted for only the last few weeks of 2017.  *See* (Miller Statement of Facts ¶ 33).

Two days after the meeting with Hall, Dr. Patrick Farrell, the Provost and Vice President for Academic Affairs, checked in with Miller via email.  After thanking Miller for "stepping in" to teach Black Poetics and supporting Peterson's independent study students, Farrell wrote: "This is a big ask—are you OK with it?"  (Mot. for Summ. J. Ex. L, at 2, ECF No. 69-14.)  He added, "From where I sit you rarely say 'no'—and you can if we're asking something that isn't reasonable or sustainable for you."  (*Id.*)  The Provost closed by offering to discuss any concerns or questions Miller might have.  (*Id.*)

Miller accepted the offer, and she and Dr. Michael Raposa (a friend and colleague) met with Farrell later that day.  *See* (*id.* at 2–3).  During the meeting, Miller

---

[2]     At times, Miller claims that Hall forced her to take Peterson's position as co-chair of a search for a professor of Africana Psychology as part of her alleged role of Interim Director.  *See* (Miller Statement of Facts ¶¶ 15, 33); (Miller Dep. 215:16–20).  Aside from her own conclusory testimony, which the Court need not credit, Miller points the Court to no evidence in the record to support this claim.  *See* (Miller Statement of Facts ¶ 15).  The same lack of evidence undercuts Miller's suggestion that she had authority to cancel contracts or spend money on behalf of Africana Studies.  *See* (Miller Dep. 106:8–15); (Hall Dep. 27:18–20); (Farrell Dep. 54:13–20, 55:14–18).  Thus, assuming (as the Court does) that Miller was Interim Director, this role consisted of teaching Black Poetics, supervising a few independent study students and acting as a conduit for information regarding Peterson's suspension to Africana Studies faculty.  This last duty appears to have involved holding a few meetings—some with Dean Hall, others without him.  *See* (Miller Dep. 106:8–15); (Hall Dep. 17:20–18:3).  Even if Miller's role as Interim Director included a few added duties, it would not change the analyses or outcomes explained below.

told the Provost that she felt unqualified to teach Black Poetics because she was not a scholar in English. *See* (Miller Dep. 118:15–119:21). *But see* (Farrell Dep. 77:12–15). It appears that Miller did not convey any unease about the other duties she had assumed. *See* (Miller Dep. 115:8–116:18, 182:23–183:2); (Farrell Dep. 67:3–68:16); *see generally* (Miler Statement of Facts). But whatever specific issues Miller raised, "Provost Farrell was very supportive." (Raposa Dep. 25:17).

3

The next week, Dean Hall faced another logistical problem. Africana Studies had a grant from the National Endowment for the Humanities, and Peterson, as the grant's Principal Investigator, controlled the funds on Lehigh's behalf. (Lehigh Undisputed Facts ¶ 6.) In discussing who should take Peterson's spot, an administrator thought it would be "a good career opportunity for [Miller]," who was already a co-investigator and had co-authored the grant application. (Mot. for Summ. J. Ex. N, at 2, ECF No. 69-16); *see* (Lehigh Undisputed Facts ¶ 39).

A few weeks later, Hall asked Miller if she was "willing to be listed as [Principal Investigator]." (Mot. for Summ. J. Ex. N, at 2, ECF No. 69-17.) Hall assured Miller that "[i]t wouldn't require specific duties" but was "more in name only" because it would be "a group effort." (*Id.*) On those conditions, Miller was "completely fine" with Hall listing her as Principal Investigator. (*Id.*); *see* (Raposa Dep. 42:1–6); (Farrell Dep. 58:13–16).

Miller's appointment as Principal Investigator rankled her Africana Studies colleagues. One faculty member was "appalled" that Lehigh had named Miller Principal Investigator without discussing it with the group. (Mot. for Summ. J. Ex. Q, at 3, ECF No. 69-19.) Another demanded that Miller apologize for not consulting her

beforehand. *See* (*id.* at 2). Responding to the "coordinated hostility aimed at [Miller]," (*id.* at 4), an administrator told the group that only a tenured professor could be Principal Investigator, and Miller was the only of the two co-investigators with tenure, (*id.* at 5). Hall also chimed in to "remind everyone that rudeness in emails [was] never acceptable." (*Id.* at 6.) Some members of Africana Studies, however, continued their hostility toward Miller. *See* (Miller Dep. 168:3–169:6); (Miller Statement of Facts ¶ 85).

Given the ongoing animosity, Miller worked to remove herself from Africana Studies. (Miller Dep. 111:13–15); (Mot. for Summ. J. Ex. R, at 15:13–17, ECF No. 69-20) (Lachter Dep.). Provost Farrell offered support and advice on how Miller might reduce or end her association with Africana Studies. *See* (*id.* Ex. S, at 2–5, ECF No. 69-21). Hall, however, wanted Miller to remain at least partially affiliated with Africana Studies given her fundraising role as Principal Investigator of the grant. *See* (Lehigh Undisputed Facts ¶ 43). After some back-and-forth, Lehigh reduced Miller's involvement with Africana Studies to ten percent, which her work as Principal Investigator would fulfill. *See* (Mot. for Summ. J. Ex. U, ECF No. 69-23); (Lehigh Undisputed Facts ¶ 45).

B

Things got worse once Dr. Essien became Interim Director of Africana Studies in January of 2018. By this time, Miller's only connection with Africana Studies was her role as Principal Investigator. *See* (Mot. for Summ. J. Ex. X, at 2, ECF No. 69-26). But that position continued to incite hostility from the Africana Studies faculty. *See* (*id.* Ex. W, at 2–4, ECF No. 69-25); (*id.* Ex. BB, at 2, ECF No. 69-30); (Farrell Dep. 60:17–24); (Hall Dep. 61:21–62:9).

The breaking point came in early April. In an email copied to Africana Studies faculty, Essien accused Miller of mismanaging the grant, skipping faculty meetings and intruding on his role as Interim Director. (Mot. for Summ. J. Ex. X, at 2–3, ECF No. 69-26.) Miller was "appalled" by Essien's "threatening" email, which she attributed to Hall's administrative missteps. (*Id.* at 3.) As she reminded Hall, he had promised that the Principal Investigator position would be a group effort. *See* (*id.*) But when he forgot to relay this arrangement to the Africana Studies faculty, they wrongly thought that Miller had appointed herself to the position. (*Id.* at 3–4.) And to insulate Miller from the growing animosity, Hall had later given Miller complete administrative control over the grant. *See* (*id.*) Yet he again failed to inform Essien about the agreement, which allowed the hostility within Africana Studies to fester. (*Id.* at 3.)

Hall replied the next morning. Although he noted that he had already explained Miller's role as Principal Investigator to Essien, Hall promised to "do so again." (*Id.* at 5.) In a separate email, Hall called a meeting with Essien and Miller to stop the "self-destructive activity in Africana [Studies]." (*Id.* Ex. AA, at 2, ECF No. 69-29.) Essien agreed to meet, but Miller refused. *See* (*id.*) She wrote: "[U]nder no circumstances will I participate in a meeting that is framed as if I am somehow responsible for the current logistical confusion . . . ." (*Id.*) Miller later explained that she declined to attend "because such a meeting would not clarify" her concerns. (*Id.* Ex. X, at 6.)

A few days later, Hall asked Miller to let him know if she wanted to continue as Principal Investigator. *See* (*id.* Ex. FF, at 2, ECF No. 69-34). After several weeks of silence, Miller resigned as Principal Investigator. *See* (*id.* Ex. EE, at 2, ECF No. 69-32). Hall accepted the resignation and thanked Miller for her "superb service." (*Id.*)

Around this time, Miller met with Lehigh's Equal Opportunity Compliance Coordinator. *See* (Lehigh Undisputed Facts ¶ 55); (Miller Dep. 40:6–43:18). Miller ostensibly reported the alleged discrimination and hostility that Essien and others at Lehigh directed at her. *See* (Mem. Opp'n Summ. J. 20, ECF No. 70-27). But there is no record of this meeting or Miller's specific complaints. *See* (Miller Dep. 40:6–43:18). Nor does it appear that any decisionmaker at Lehigh—such as Provost Farrell or Dean Hall—knew that Miller had met with the Equal Opportunity Compliance Coordinator. *See generally* (Hall Dep.); (Farrell Dep.); (Miller Dep.); (Miller Statement of Facts).

Later in April, Miller filled a complaint with the United States Department of Education's Office of Civil Rights. In the complaint, Miller noted that she had not tried to resolve her dispute through Lehigh's grievance process. *See* (Mot. for Summ. J. Ex GG, at 4–5, ECF No. 69-35) (OCR Compl.). She then recounted the stress and "coordinated hostility" that she endured following Peterson's suspension, (*id.* at 6), and which worsened over the spring, *see* (*id.* at 12–14). This treatment, Miller alleged, constituted race- and gender-based discrimination and retaliation. *See* (*id.* at 4). Once again, there is no evidence that anyone at Lehigh knew about the OCR complaint before November of 2018.[3]

---

[3] During oral argument, Miller claimed that there was evidence in the record that Lehigh learned of the OCR complaint in July of 2018. *See* (Tr. of Summ. J. Hr'g 76:23–25). Specifically, she believed that there was "a letter," as well as testimony from Miller and "someone else in the administration," to support her claim. (*Id.* at 77:9–11.) Though it is Miller's burden to cite specific record evidence to overcome Lehigh's claim that it had no notice of Miller's OCR complaint, *see* Fed. R. Civ. P. 56(c), the Court independently scoured the record. That search turned up no documentary or testimonial evidence that Lehigh knew of Miller's OCR complaint before November of 2018, when it learned of Miller's EEOC complaint. *See* (Resp. Opp'n Summ. J. Ex. W, at 2, ECF No. 70-25) (indicating that a copy of Miller's EEOC Charge—which referenced the OCR complaint—was sent to Lehigh's General Counsel).

Though classes had not ended, Miller left campus in late April to tend to ill relatives. (Lehigh Undisputed Facts ¶ 60.) To accommodate Miller, Lehigh let her teach her last two classes online. (Lachter Dep. 35:7–8.) But her absence sparked student complaints; one student lamented that the class had not heard from Miller in a week and had "no idea" if there was a final exam or, if so, what material it would cover. (Mot. for Summ. J. Ex. HH, at 2, ECF No. 69-36.)

Dr. Jackie Krasas, a friend and the Associate Dean overseeing WGSS, also had not heard from Miller in almost three weeks. *See* (Miller Statement of Facts ¶ 63); (Mot. for Summ. J. Ex. P, at 105:4–14) (Krasas Dep.). During Miller's silence, several issues had arisen that needed her attention as Director of WGSS. *See* (Mot. for Summ. J. Ex. II, at 2, ECF No. 69-37) (Krasas Emails). In an email, Krasas described the pending issues and how Miller's absence had complicated matters and forced others to cover her duties. *See* (*id.*) Miller apologized the next day for her "radio silence" and thanked Krasas for "attending to . . . important and time-sensitive matters in [her] absence." (*Id.* at 4.) She also promised "to be more responsive and attentive" to WGSS matters and that she would "be around" over the summer. (*Id.*)

Despite these assurances, a month passed with no word from Miller. *See* (*id.* at 9–10). Since her last contact, Miller had neglected "some semi-pressing [WGSS] issues," such as planning the retreat and submitting the annual report. (*Id.*) When Krasas tried to contact Miller about these issues, Miller never responded. *See* (*id.* at 10–11); (Krasas Dep. 107:21).

After another month of silence, Krasas met with Dr. Cameron Wesson, who was filling in as Dean after Hall left for another university. *See* (Lehigh Undisputed Facts

¶ 66). Krasas raised concerns about Miller's performance as Director. *See* (Krasas Emails 13–14). For example, she lamented how Miller had been out of contact for over two months, cancelled an important course the night before the first class, failed to schedule any classes for future semesters, held "few if any faculty meetings," neglected to file the annual report and ignored "students who needed advising." (*Id.*)

A few weeks later, Wesson asked Provost Farrell for guidance. *See* (Mot. for Summ. J. Ex. JJ, at 2, ECF No. 69-38). Despite "treating [Miller] with kid gloves" and accounting "for the difficulties of th[e] past spring," Wesson thought Miller's performance as Director "border[ed] on outright neglect." (*Id.*) Farrell agreed with Wesson and Krasas that there was "good reason to replace [Miller] as WGSS Director." (*Id.*) But before making the change, Farrell suggested that, to avoid damaging Miller's reputation or leading others to think she had "been unwillingly pushed out," Krasas should ask Miller about her interest in remaining as Director. (*Id.*)

Following Farrell's advice, Krasas emailed Miller in early August. She noted how Miller's near three-month silence had harmed WGSS students and the program generally. *See* (Krasas Emails 16). Hoping to avoid further damaging the program, Krasas asked Miller to indicate whether she wanted to remain Director. *See* (*id.*) Absent a prompt response, Krasas would assume that Miller agreed to step down as Director. *See* (*id.*)

After two weeks with no response, Wesson removed Miller as Director. In his letter, Wesson thanked Miller for her service but explained that her "serious lapses," such as her inadequate programming and failure to communicate, threatened the "long-term health of the program." (Mot. for Summ. J. Ex. KK, at 2, ECF No. 69-39.) In

losing the directorship, Miller also lost "one-ninth of [her] salary" and the reduction in her class load. (*Id.*)

C

Three months after her last contact with Lehigh, Miller requested and received a one-year medical leave of absence. (Lehigh Undisputed Facts ¶ 72.) She described the cause as "a nervous breakdown." (Miller Dep. 206:14–15.) This breakdown began in November of 2017, became unmanageable the next spring and was first documented by a medical provider in May of 2018. *See* (*id.* at 206:12–207:17). During the summer of 2018 before taking leave, Miller attended a conference in Switzerland, worked on several book projects and hired a lawyer. *See* (*id.* at 33:13–34:3, 67:4–13.194:12–19, 259:14–260:9, 265:1–6). While on leave, Miller continued to travel as part of her therapy and attended a conference or two, but she stopped her other academic projects. *See* (*id.* at 67:4–70:8).

In September of 2018, Miller checked into an in-patient medical facility. *See* (*id.* 270:1–3). Doctors diagnosed her with "disorganized thinking, paranoia, severe anxiety and fear." (Resp. Opp'n Summ. J. Ex. X, at 6, ECF No. 70-26.) During her twelve-day stay at the medical facility, Miller was represented by counsel and had access to her laptop, which she used to complete some paperwork. *See* (*id.*); (Miller Dep. 271:1–12).

On November 2, Miller filed a Charge of Discrimination against Lehigh with the EEOC. *See* (Lehigh Undisputed Facts ¶ 73). In the Charge, Miller alleged that Lehigh wanted to project an image of racial equality and deflect from Peterson's suspension for sexual harassment. *See* (Mot. for Summ. J. Ex. LL, at 2–4, ECF No. 69-40) (EEOC Charge). Lehigh achieved that goal, Miller said, by forcing her—an African American woman—to take over Peterson's academic and administrative duties, for which she was

12

neither qualified nor compensated. *See* (*id.* at 2–5). She added that through this race- and gender-based discrimination, Lehigh set her up to fail and exposed her to hostility from her colleagues. *See* (*id.* at 5–6). Beyond the discrimination, Miller claimed that Lehigh's failure to remedy the situation was retaliation for her complaints about how Lehigh handled Peterson's suspension. *See* (*id.* at 7). Miller never mentioned her removal as WGSS Director in the EEOC Charge. (Lehigh Undisputed Facts ¶ 73.)

After the EEOC dismissed her Charge, Miller sued Lehigh in federal court. Her Complaint asserted claims for race- and gender-based discrimination under Title VII, racial discrimination under 42 U.S.C. § 1981 and retaliation under both Title VII and § 1981.[4] *See* (Compl. ¶¶ 215–21, ECF No. 1). Lehigh now moves for summary judgment on all claims. *See* (Mot. for Summ. J., ECF No. 69). The Court held oral argument on Lehigh's Motion on January 22. *See* (ECF No. 76).

## II

Summary judgment is proper if the movant proves that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). A fact is "material" if it may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[4] Though much of the Complaint recounts Peterson's alleged sexual harassment and the general hostility Miller endured, Miller did not assert a hostile-work-environment or sexual-harassment claim against Lehigh. *See* (*id.*); (Mem. Opp'n Summ. J. 8); (Tr. of Summ. J. Hr'g 28:12–19) (admitting Miller's case does not include a hostile-work-environment claim); (Tr. of Sept. 2019 Hr'g 3:16–22, ECF No. 51). Miller could have moved to amend the Complaint to add these claims, but she did not. *See* (*id.* at 3:16–4:2).

*Id.* A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252.

At summary judgment, a court may consider any material in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387–88 (3d Cir. 1999). In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[5] *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

### III

Miller asserts two sets of claims against Lehigh. She first contends that Lehigh violated Title VII by (1) discriminating against her on the basis of race and gender and (2) retaliating against her. Miller next claims race-based discrimination and unlawful retaliation under 42 U.S.C. § 1981.

Lehigh is entitled to summary judgment on all claims. For the Title VII claims, Lehigh's alleged discriminatory and retaliatory acts are either time barred or unexhausted. And on the merits, no reasonable juror could find that Lehigh discriminated or retaliated against Miller under Title VII. Though Miller's § 1981 claims are neither barred nor unexhausted, the undisputed evidence precludes a

---

[5] Lehigh asks the Court to accept its version of the facts as uncontested as punishment for Miller's untimely response to Lehigh's Motion. *See* (Mot. to Proceed per Rule 56(e), ECF No. 71). The Court declines to adopt so harsh a sanction for a few days' delay.

reasonable juror from returning a verdict for Miller on the § 1981 discrimination or retaliation claims.

A

1

To bring a Title VII suit, a plaintiff "must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). Discrete discriminatory acts falling outside that 300-day window are barred even if "they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The scope of the EEOC complaint sets the parameters of the later federal court action. *See Mandel*, 706 F.3d at 163. That is, a plaintiff cannot raise a Title VII claim in federal court unless that claim is within the scope of her EEOC complaint. *See id.* at 163–64.

Miller's Title VII claims rely on two alleged discriminatory and retaliatory acts by Lehigh. The first act—appointing her Interim Director of Africana Studies and Principal Investigator of the grant—occurred in November of 2017. *See* (Tr. of Summ. J. Hr'g 32:21–22); (Lehigh Undisputed Facts ¶¶ 21–22, 28, 37–39). The second act—removing her as Director of WGSS—was in August of 2018. *See* (Mot. for Summ. J. Ex. KK, at 2). Both acts run afoul of Title VII's procedural requirements.

i

The first act is time barred. Miller filed her EEOC Charge on November 2, 2018. *See* (*id.* at ¶ 73). Absent equitable tolling, all acts occurring before January 6, 2018— including Miller's appointment as Interim Director and Principal Investigator—are therefore barred. And there is no basis for equitable tolling here. Miller does not allege

that Lehigh actively misled her or that she mistakenly asserted her rights in the wrong forum. *See* (Mem. Opp'n Summ. J. 8–9). Rather, she claims that her hospitalization prevented her from asserting her rights. *See* (Tr. of Summ. J. Hr'g 32:13–16). The record proves otherwise; Miller had access to her laptop while hospitalized, *see* (Miller Dep. 271:1–12), and she had retained counsel months earlier, *see* (*id.* at 194:12–19, 265:1–6). With a laptop and counsel, Miller's hospitalization did not prevent her from asserting her rights "in some extraordinary way." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 1965 F.3d 236, 240 (3d Cir. 1999); *cf. Kach v. Hose*, 589 F.3d 626, 644–45 (3d Cir. 2009); *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 233 (5th Cir. 1999); *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 402 (E.D. Pa. 2002).

Even if equitable tolling applied, it would not help Miller. Lehigh's supposedly unlawful act was imposing upon her Peterson's duties as Principal Investigator and Director of Africana Studies. *See* (Tr. of Summ. J. Hr'g 37:20–23); *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980) (instructing courts "to identify precisely the 'unlawful employment practice'" at issue). Discriminatorily imposing extra duties, like failing to promote, adequately pay or transfer, is a discrete act. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 638–39 (2007), *overruled by statute on other grounds*. Lehigh's discrete act occurred in November—not December—of 2017. *See* (Tr. of Summ. J. Hr'g 32:21–22). And because the continuing-violation doctrine is inapplicable to discrete acts, it is irrelevant that Miller was Interim Director until December 31 and Principal Investigator until spring of 2018. *See Morgan*, 536 U.S. at 112–13; *cf. Ricks*, 449 U.S. at 257; *Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*, 667 F.2d 1074, 1083 (3d Cir. 1981). Nor is it relevant that the ill effects of

Miller's appointments lingered into spring. *See Ledbetter*, 550 U.S. at 628 ("[C]urrent effects alone cannot breathe life into prior, uncharged discrimination."); *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001) (holding that failure to remedy effects of discrete act does not extend limitations period); *Bennett v. Susquehanna Cty. Children & Youth Servs.*, 592 F. App'x 81, 85 (3d Cir. 2014) (unpublished) ("[E]motional suffering is merely the effect of an isolated act . . . ."). In sum, any Title VII claims based on Miller's appointment as Principal Investigator or Interim Director are barred.

## ii

Though not time barred, Lehigh's second act—removing Miller as WGSS Director—is unexhausted. Miller concedes that she did not raise her removal before the EEOC. (Tr. of Summ. J. Hr'g 30:21–22.) Indeed, she never mentioned it until midway through discovery. *See* (Miller Letter Br. at 2, ECF No. 59); (Tr. of Oct. 2019 Hr'g 5:6–9). Lehigh, by contrast, raised its exhaustion defense in its first pleading. *See* (Answer 34, ECF No. 3). And once it learned of the removal allegation, Lehigh objected on exhaustion grounds. *See* (*id.* at 10:22–25); (Mem. Supp. Summ. J. 3–4, ECF No. 69-44). Unable to rely on either of Lehigh's allegedly discriminatory or retaliatory acts, Miller has no viable Title VII claims.

## 2

Even ignoring the procedural impediments, no reasonable juror could return a verdict for Miller on the merits of her Title VII discrimination claim. To state a *prima facie* case of discrimination under Title VII, Miller must show that (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) members outside the protected class were treated more favorably or the circumstances "give rise to an inference of intentional

discrimination."[6] *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). If Miller carries her burden,

Lehigh must "offer a legitimate non-discriminatory justification for the adverse

employment action." *Id.* (alteration in original omitted) (quoting *Smith v. City of

Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)). Miller then must "provide evidence from

which a factfinder could reasonably infer that [Lehigh's] proffered justification is

merely a pretext for discrimination." *Id.*

i

Miller argues that Lehigh discriminated against her on the basis of race and

gender by forcing her to assume Peterson's duties as Principal Investigator of the grant

and Director of Africana Studies. *See* (Mem. Opp'n Summ. J. 14–17); (Tr. of Summ. J.

Hr'g 28:2–5). She alleges that she was unqualified to teach Black Poetics or supervise

Peterson's independent study students because she was not an English scholar. *See* (*id.*

at 63:2–6); (Mem. Opp'n Summ. J. 14). Nor was she qualified to be Interim Director or

Principal Investigator because she had never directed "a program in crisis" or served as

a Principal Investigator. (Miller Dep. 148:2–9); *see* (Miller Letter Br. 4, ECF No. 59).

Miller claims that Lehigh ignored her lack of qualifications because it needed a black

woman to distract from the racial and gender problems purportedly plaguing the

university. *See* (*id.* at 2–5). And she alleges that Lehigh never compensated her for

---

[6]      Both parties apply the *McDonnell Douglas* pretext analysis, rather than the *Price Waterhouse* mixed-motive analysis. *See* (Mem. Supp. Summ. J. 4–5); (Mem. Opp'n Summ. J. 11–13). The Court also applies the pretext analysis but notes that Lehigh would also be entitled to summary judgment under the mixed-motive analysis; there is no record evidence from which a reasonable juror could find that race or gender was a motivating factor in Miller's appointment as Interim Director and Principal Investigator or her removal as WGSS Director. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 & n.5 (3d Cir. 2016) (discussing the differences between the pretext and mixed-motive analyses).

these added duties, which also exposed her to hostility from the Africana Studies faculty. *See* (Mem. Opp'n Summ. J. 16–17).

Though Miller is clearly a member of a protected class, whether she was qualified for the job is less clear. Ordinarily, the plaintiff argues that she was qualified for the position, and the employer says the opposite. Here the positions are reversed: Miller argues that she was unqualified to be Principal Investigator or Interim Director,[7] *see* (Miller Dep. 148:2–9, 149:2–13), and Lehigh claims that she was qualified for these positions, *see* (Tr. of Summ. J. Hr'g 10:1–12:3). Despite the inverted arguments, Lehigh must prove it is entitled to summary judgment; it cannot carry that burden here because, on this record, a reasonable juror could find that Miller—despite her protestations to the contrary—was qualified. *See, e.g.*, (Hall Dep. 16:12–15); (Miller Dep. 123:1–2); (Raposa Dep. 40:13–16, 41:21–22, 42:12–22).

Assuming she was qualified, Miller cannot show that she suffered an adverse employment action. An adverse employment action is one "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)). Reduction in pay, termination or suspension without pay are classic examples of adverse employment actions. *See Jones*, 796 F.3d at 326. But "general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus," cannot support a discrimination claim. *Barnees v. Nationwide Mut. Ins. Co.*,

---

[7]     At times, Miller seems to argue that the relevant question is not whether she was qualified to be Principal Investigator or Interim Director, but whether she was qualified to be an Associate Professor generally. *See* (Mem. Opp'n Summ. J. 14). Because the Court concludes that Miller's Title VII discrimination claim fails for other reasons, it need not address this argument.

598 F. App'x 86, 90 (3d Cir. 2015) (unpublished).  Similarly, "lateral transfers and changes of title or reporting relationships" generally are not "adverse employment actions."  *Stewart v. Union Cty. Bd. of Educ.*, 655 F. App'x 151, 157 (3d Cir. 2016) (per curiam) (unpublished); *see Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd.*, 704 F. App'x 164, 168 (3d Cir. 2017) (unpublished).  Nor is "receipt of a less than expected [pay] increase."  *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 845 (3d Cir. 2016) (unpublished).

No reasonable juror could find that Miller's appointment as Principal Investigator and Interim Director was an adverse employment action.  That appointment did not reduce Miller's pay or other benefits.  *See* (Miller Dep. 143:24–144:2); (Lehigh Undisputed Facts ¶ 15).  To the contrary, Lehigh gave Miller a "course off" for teaching Black Poetics.  (Mot. for Summ. J. Ex. K, at 2.)  That Miller did not also get a pay raise "does not constitute a material change in the terms or conditions of employment."  *Tourtellotte*, 636 F. App'x at 845; *see also* (Krasas Dep. 70:4–16) (testifying that she received no compensation when she was an interim director).  And Lehigh's imposition of the extra duties on Miller helped—not hindered—her prospects for promotion or professional growth.  *See* (Resp. Opp'n Summ. J. Ex. S, at 2, 20) (listing Interim Director and Principal Investigator positions on her résumé); (Mot. for Summ. J. Ex. N, at 2) (describing Principal Investigator role as "a good career opportunity for [Miller]").  In short, although Miller's appointment as Principal Investigator and Interim Director may have contributed to her emotional distress, it was not an adverse employment action.  *Cf. Harris v. Attorney General*, 687 F. App'x 167, 169 (3d Cir. 2017) (unpublished).

Even if Miller suffered an adverse employment action, she still cannot establish a *prima facie* discrimination claim. As she admits, there is no evidence that Lehigh treated members outside her protected classes more favorably. (Tr. of Summ. J. Hr'g 50:22–51:1); *see* (Mem. Opp'n Summ. J. 17–18) (offering no argument). For example, Miller never alleges that Lehigh compensated Peterson for serving as Principal Investigator. *See generally* (Compl.); (Mem. Opp'n Summ. J.); (Miller Statement of Facts). The record shows that Krasas (a woman) received no compensation for her informal service as interim director. (Krasas Dep. 70:4–6). Though Lehigh paid Dr. Essien (an African American man) for his time as Interim Director with a one-ninth salary bump and a course off, (Mot. for Summ. J. Ex. J, at 2), Miller also got a course off for taking on some of Peterson's duties, (*id.* Ex. K, at 2). In any event, Essien and Miller were not similarly situated. He was formally appointed Interim Director for a whole semester; Miller informally assumed some of an Interim Director's duties for a few weeks during the slowest time of the semester. *See* (Hall Dep. 27:22–28:8); (Farrell Dep. 54:13–20). At bottom, Miller offers nothing more than unsupported speculation to suggest that her race or gender had anything do to with her appointment as Principal Investigator and Interim Directed. *See* (Miller Letter Br. 2–5); (Miller Dep. 112:4–113:16); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799 (3d Cir. 2003) (refusing to credit "speculative" evidence as supporting inference of discrimination).

Beyond Miller's failure to establish a *prima facie* case, Lehigh had legitimate nondiscriminatory reasons for appointing her as Principal Investigator and Interim Director. As Dean Hall explained, he asked Miller to teach Black Poetics because it involved an area of her expertise, "hip hop culture," and the class was cross-listed with

Africana Studies. (Hall Dep. 68:19). Miller admits that she is an expert on hip hop and that Black Poetics involved at least some hip-hop studies and offers nothing to suggest Hall's stated reasons were pretextual. *See* (Tr. of Summ. J. Hr'g 62:18–19, 63:2–6); (OCR Compl. 7); (Miller Dep. 34:11–17); *see also* (Raposa Dep. 42:19–22). Both Hall and Provost Farrell testified that Miller was picked as the point of contact for Africana Studies because she was the most senior tenured member of Africana Studies. (Lehigh Undisputed Facts ¶ 28); (Hall Dep. 19:16–25); (Farrell Dep. 27:22, 29:21–30:8). Nothing in the record casts doubt on that explanation. In fact, Miller's friends and colleagues agreed that "she would be a good person" for these tasks because "[s]he was an established star in . . . Africana Studies." (Raposa Dep. 14:8–12.) And Lehigh appointed Miller as Principal Investigator because she had helped draft the grant application and was the only existing co-investigator with tenure. *See* (Mot. for Summ. J. Ex. Q, at 5); (Lehigh Undisputed Facts ¶¶ 37–39). Once again, the record lacks any evidence that this reason was pretext for discrimination. *See, e.g.*, (Raposa Dep. 41:21–22) (saying Miller was "the logical person" to be Principal Investigator).

ii

Miller's second Title VII discrimination claim relies on her removal as WGSS Director. The specifics of this theory are murky. *See* (Tr. of Summ. J. 56:12–62:16). But Miller seems to argue that, after using her as "a pawn because of her race" and gender, Lehigh unfairly discarded her as WGSS Director when it no longer needed her for public appearances. (*Id.* at 59:20.)

This claim fails at the *prima facie* stage. Miller is a member of a protected class; she was qualified to be WGSS Director, and her removal as Director constituted an adverse employment action. *See* (Hall Dep. 19:16–25); (Raposa Dep. 14:7–18); (Mot. for

Summ. J. Ex. KK, at 2). But she fails to identify even one similarly situated individual outside her protected classes whom Lehigh treated more favorably. *See* (Mem. Opp'n Summ. J. 17–18). And Miller effectively concedes that she lacks any specific evidence from which a reasonable juror could infer discrimination. *See* (Tr. of Summ. J. 54:21–56:11, 58:8–62:16). Without that evidence, she cannot make the required *prima facie* showing.

At any rate, the record abounds with evidence that Lehigh had legitimate, nondiscriminatory reasons to remove Miller as WGSS Director. She ignored everyone at Lehigh (including students) for months—despite assurances that she would be on campus over the summer. *See* (Krasas Emails 4, 16); (Krasas Dep. 110:18–21). She was the only Director to never file an annual report. *See* (*id*. 111:4–16). She canceled an important WGSS course the night before the first class and never scheduled classes for future semesters. *See* (Krasas Emails 13). Despite this neglect, Lehigh invited Miller to remain as Director if she remedied past mistakes. *See* (*id*. at 16–17). Alternatively, Lehigh offered her a graceful way to step down without tarnishing her reputation. *See* (*id*.); (Mot. for Summ. J. Ex. JJ, at 2). Only after Miller declined to express an interest in remaining as Director did Lehigh remove her. *See* (*id*.)

To rebut Lehigh's proffered rationale, Miller relies on only a few lines of testimony from Dr. Raposa. *See* (Tr. of Summ. J. Hr'g 61:3–9). According to Raposa, "nobody [at Lehigh] returns emails during the summer and lots of directors don't file an annual report." (Raposa Dep. 66:22–24.) And he had "never heard of anyone in [his] 35 years at Lehigh who was ever relieved of their duties as director of a program for those kinds of reasons." (*Id*. at 66:24–67:2.) Nevertheless, Raposa never hinted that Lehigh's

23

stated reasons for removing Miller were mere pretext for discrimination.  *See* (*id.*)
Instead, he offered only generalizations and speculation.  *See* (Tr. of Summ. J. Hr'g
61:17–62:16).  This guesswork from second-hand information is too thin a reed to prop
up Miller's discrimination claim under the weight of the evidence of Lehigh's
nondiscriminatory reasons for removing her.  *Cf. N.L.R.B. v. FES (a Div. of Thermo
Power)*, 301 F.3d 83, 95 (3d Cir. 2002).

3

Like her discrimination claim, even if Miller's Title VII retaliation claim
overcomes its procedural shortcomings, it fails on the merits.  To assert a *prima facie*
case of retaliation, "a plaintiff must show that (1) she engaged in a protected activity,
(2) she suffered an adverse employment action, and (3) there was a causal connection
between the participation in the protected activity and the adverse action."  *Carvalho-
Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).  The defendant then
must "provide a legitimate non-retaliatory reason for its conduct."  *Id.*  Finally, "the
burden shifts back to the plaintiff to convince the factfinder" that the defendant's
explanation was pretextual and "that retaliation was the real reason for the adverse
employment action."  *Id.* (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d
Cir. 2006)).

Miller argues that Lehigh retaliated against her by removing her as WGSS
Director.[8]  This retaliation, she claims, was prompted by two protected activities—her
meeting with Lehigh's Equal Opportunity Compliance Coordinator and her OCR

---

[8]     Although Miller initially argued that her appointment as Interim Director and Principal
Investigator was retaliation, she abandoned this claim after noting that no protected activity
preceded this alleged retaliation.  *See* (Tr. of Summ. J. 64:2–66:5); *Daniels v. Sch. Dist. of Phila.*, 776
F.3d 181, 196 (3d Cir. 2015) ("We need not consider the first alleged instance of adverse action as
Daniels's forced transfer without notification preceded her first protected activity . . . .").

complaint.  *See* (Tr. of Summ. J. Hr'g 66:15–16, 67:24–25).  Both protected activities

occurred in April of 2018, about four months before Lehigh removed Miller as WGSS

Director.  *See* (*id.* at 67:24–68:10).  Though Miller tried to close that four-month gap by

arguing that Lehigh learned of the OCR complaint in July, *see* (Tr. of Summ. J. Hr'g

76:23–25), there is no evidence in the record that Lehigh knew of the OCR complaint or

Miller's meeting with the Equal Opportunity Compliance Coordinator until November

of 2018.  *See* (Resp. Opp'n Summ. J. Ex. W, at 2, ECF No. 70-25) (showing Lehigh

received a copy of Miller's EEOC Charge, which referenced the OCR complaint).

Therein lies the problem—Miller cannot link her protected activities to her

removal as Director.  A four-month gap between the protected activities and adverse

action is too long to suggest a retaliatory motive.  *See Carvalho-Grevious*, 851 F.3d at

261 n.8.  There is no evidence of intervening antagonism by Lehigh during that gap;

aside from one email, Miller had no contact with Lehigh after she left campus in late

April of 2018.  *See* (Lehigh Undisputed Facts ¶ 60); (Krasas Emails 4, 16).  Lehigh's

explanation for removing Miller was reasonable and consistent.  *See* (Krasas Emails 4–

17); (Krasas Dep. 110:18–21, 111:4–16); (Mot. for Summ. J. Ex. JJ, at 2).  And more to

the point, there is no evidence that any decisionmaker at Lehigh knew of Miller's

protected activities when it removed her.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d

181, 196 (3d Cir. 2015).  Simply put, no reasonable juror could infer a connection

between Miller's removal and her protected activities.[9]

---

[9]     Nor could a reasonable juror find that Lehigh's stated reasons for removing Miller were
pretext for retaliation.  As with her discrimination claim, Miller has no evidence of pretext beyond
Raposa's generalizations and speculation.  For the reasons stated above, the meager showing is
insufficient to show pretext.

B

Mirroring her Title VII claims, Miller asserts a discrimination and a retaliation claim against Lehigh under 42 U.S.C. § 1981. These claims rely on the same alleged acts of discrimination and retaliation discussed earlier. Though the § 1981 claims lack the Title VII claims' procedural flaws, they meet the same fate on the merits. That is, no reasonable juror could find that Lehigh discriminated or retaliated against Miller under § 1981.

1

Although the rights guaranteed by § 1981 closely resemble those in Title VII, the former lacks any administrative prerequisites. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989), *superseded by statute on other grounds as stated in CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). For example, a plaintiff need not comply with Title VII's exhaustion requirements to sue under § 1981. And the four-year federal catch-all statute of limitations—rather than Title VII—governs these § 1981 actions. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383–85 (2004); 28 U.S.C. § 1658(a).

Miller sued Lehigh in March of 2019, so her appointment as Interim Director and Principal Investigator falls within the limitations period—as does her removal as WGGS Director. *See* (Compl.); (Lehigh Undisputed Facts ¶¶ 21–22, 28, 37–39); Mot. for Summ. J. Ex. KK, at 2). Similarly, Miller's failure to raise her removal before the EEOC is irrelevant for § 1981 purposes. *See* (Tr. of Summ. J. Hr'g 7:20–8:2).

2

Both § 1981 claims fail on the merits. To maintain a claim for racial discrimination under § 1981, a plaintiff must show that (1) she "belongs to a racial

minority," (2) the defendant intended to discriminate against her because of her race, and (3) the discrimination concerned "one or more of the activities enumerated in § 1981." *Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017) (quoting *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010)). In the employment context, a plaintiff must also show that she suffered an adverse employment action. *See id.* The burden then shifts "'to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* at 263 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The plaintiff then must show "that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken." *Id.*

No reasonable juror could find that Lehigh discriminated against Miller on the basis of race. Miller's appointment as Principal Investigator and Interim Director did not diminish her pay, rank, benefits or advancement prospects. *See* (Miller Dep. 143:24–144:2); (Lehigh Undisputed Facts ¶ 15); (Resp. Opp'n Summ. J. Ex. S, at 2, 20); (Mot. for Summ. J. Ex. N, at 2). Thus, no reasonable juror could deem that act an adverse employment action. What's more, beyond unsupported speculation, there is no evidence that race played any role in Lehigh's appointing Miller to these positions or that Lehigh's nondiscriminatory reasons for doing so were pretext. *See* (Tr. of Summ. J. Hr'g 50:22–51:1); (Mem. Opp'n Summ. J. 17–18); (Miller Letter Br. 2–5); (Lehigh Undisputed Facts ¶ 28); (Hall Dep. 19:16–25); (Farrell Dep. 27:22, 29:21–30:8). This same dearth of evidence precludes any reasonable juror from finding that Lehigh removed Miller as WGSS Director because of her race. *See* (Tr. of Summ. J. 54:21–

56:11, 58:8–62:16); (Krasas Emails 4–17); (Mot. for Summ. J. Ex. JJ, at 2); (*id.* Ex. KK, at 2).

Nor could any reasonable juror find that Lehigh retaliated against Miller under § 1981 by removing her as WGSS Director. The elements of § 1981 retaliation are the same as under Title VII—except under § 1981, a plaintiff must also prove "that there had been an underlying section 1981 violation." *Estate of Olivia*, 604 F.3d at 798. As noted earlier, Miller cannot link her protected activities and removal as Director. *See* (Tr. of Summ. J. 54:21–56:11, 58:8–62:16); (Krasas Emails 4–17); (Mot. for Summ. J. Ex. JJ, at 2); (*id.* Ex. KK, at 2). That failing aside, there is no underlying § 1981 violation. For either or both reasons, Lehigh is entitled to summary judgment on the § 1981 retaliation claim.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.